The opinion of the Court was delivered by
Mr, Chief Justice Marshall.
This case was stated in the opinion given on the motion fór dismissing the writ of error for want of jurisdiction in the Court. It now comes on to be decided on the question whether the Borough Court of Norfolk, in overruling the defence «et up under *441 the act of Congress, has misconstrued that act. It is in these words:
The act qf Congress, em-pow~rah~. the Corpo~ion of the C~f~ of Washington to authoii~e the (lrswing of lot-ter~es~ c~oes not purpnr-t, and was not intend. ed, to author. ire the Corporation to force the sale of hi tickets n~ such lotterks in States where such sale is pro. bibited by the State laws.
*441 “ The said Corporation shall have full power to authorize the drawing of lotteries for effecting any important improvement in th City, which the ordinary funds or revenue thereof will not accomplish: Provided, that the sum to.be raised in each year shall not exceed the amount of 10,000 dollars: And provided, also, that the object for which the money is intended to be raised shall be first submitted to the President of the United States, and shall be approved of by him.”
Two questions arise on this act.
1st. Does it purport to authorize the Corporation to force the sale of these lottery tickets in States where such sales may be prohibited by law ? If it does,
2d. Is the law constitutional ?
If the first question be answered in the affirmative, it will become necessary to consider the second. If it should be answered in the negative, it will be unnecessary, and consequently improper, to pursue any inquiries, which would then be merely speculative, respecting the power of Congress in the case.
In inquiring into the extent of the power granted to the Corporation of Washington, we rnust first examine the words of the grant. We find in them no expression which looks beyond the limits of the City. The powers granted are all of them local in their nature, and all of them such as would, in the common course of things, if not necessarily, be exercised *442 within the city. The subject on which Congress ~vas employed when framing this act was a local subject; it was not the establishment of a lottery, but the formation of a separate body for the management of the ii. ernal affa~r~ of the City, for its internal government, for its police. Congress must have considered itself as delegating to this corporate body powers for these objects, and fbr these objects solely. In delegating these powers, therefore, it seems reasonable to suppose that the mind of the legislature was directed to the City alone, to the action of the being they were creating within the City, and not to any extra-territorial operations. In describing the pnwers of such a being, no words of II-mitation need be used. They are limited •by the subject. But, if it be intended to give its acts a binding eftIcacy beyond the natural limits of its power, and within the jurisdiction of a distinct power, we should expect to find, in the language of the incorporating act, some words indicating such intention.
Without such words, we cannot suppose that Congress designed to give to the acts of the Corporation any other effect, beyond its limits, than attends every act having the sa~iction of local law, when aiiy thi4lg depends uj~on it which is to be~ transacted elsewhere.
If this would be the reasonable construction of corporate powth generally it is more especially proper in a case where an attempt is made so to exercise those powers as to control and limit the penal laws of a State. This is an operation which was not, *443 we think, in the contemplation of the legislature, while incorporating the City of Washington.
To interfere with the pena! laws of a State, where they are not levelled against the legitimate powers of the Union, but have for their sole object the internal government of the country, is a very serious mear sure, which Congress cannot be supposed to adopt lightly, or inconsiderately. The motives for it must be serious and weighty. It would be taken deliberately, and the intention would be clearly and unequivocally expressed.
An act, such as that under consideration, ought not, we think, to be so construed as to imply this intention, unless its provisions were such as to render the construction inevitable.
We do not think it essential to the corporate power in question, that it should be exercised out of the City. Could-the lottery be drawn iii any State of the Union ? Does the corporate power to authorize the drawing of a lottery imply a power to authorize its being drawn without the jurisdiction of a Corporation, in a place where it may be prohibited by law ? This, we think, would scarcely be asserted. And what clear legal distinction can be taken be-twéen a power to draw a lottery in a place where it is prohibited by law, and a power to establish an office for the sale of tickets in a place where it is prohibited by law ? It may be urged, that the place where the lottery is drawn is of no importance to the ' Corporation, and therefore the act need not be so construed as to give power over the place, but that the right to sell tickets throughout the United *444 States is of importance, and thereforfe ought to be implied.
. . • r That the power to sell tickets m every part of tjie United States might facilitate their sale, is not to be denied; but it does not follow that Congress designed, for the purpose of giving this increased facility, to overrule the penal laws of the several States. In the City of Washington, the great metropolis of the nation, visited by individuals, from every part of the Union, tickets may be-freely sold to all who are willing to purchase. Can if be affirmed that this is so limited a market, that the incorporating act must be extended .beyond its words, and made, to conflict .with the internal police of the States, unless it be construed to give a more extensive market?
It has been said, that the States cannot make it unlawful to buy that which Congress has made it lawful to sell.
This proposition is not denied; and, therefore, the validity of a law punishing a citizen of Virginia for purchasing a ticket in the City of Washington, might well be drawn into question. Such a law would be a direct attempt to counteract and defeat a measure authorized by the United States. But a law to punish the sale of lottery tickets in Virginia, is of a different character. Before we can impeach its validity, we must inquire whether Congress in- . tended to empower this Corporation to do any act within a State which the laws of that State might prohibit.
*445 In addition to the very important circumstance, that the act contains no words indicating such inten-tioir, and that this extensive construction is not essential to the execution of the corporate power, the Court cannot resist the conviction, that the intention ascribed to this act, had it existed, would have been executed by very different means from those which have been employed.
Had Congress intended to establish a lottery for those improvements in the City which are deemed national, the lottery itself would have become the subject of legislative consideration. It would be organized by law,' and agents for its execution would be appointed by the President, or in such other manner as the law might direct. If such agents were to act out of the District, there would be, probably, some provision made for such a state of things, and in making such provisions Congress would examine its power to make them. The whole subject would be under the control of the government, or of persons appointed by the government.
But in this case no lottery is established by law, no control is exercised by the government over any which'may be established. The lottery emanates from*a corporate power. The Corporation may authorize, or not authorize it,, and may select the purposes to which the proceeds are to be applied. This Corporation. is a being intended for local objects only. All its capacites are limited to the City. This, as well as every other law it is capable of making, is a by-law, and, from its nature, is only co-extensive with the City. It is not probable that *446 such an agent would be employed in the execution of a lottery established by Congress; but when it acts, not as the agent for carrying into effect a lottery established by Congress, but in its own corporate capacity, from its own corporate powers, it is reasonable to suppose that its acts were intended to partake of . the nature of that capacity and of those powers; and, like all' its other acts, be merely local in its nature.
The proceeds of these lotteries are to come in aid of the revenues of the City. These revenues are raised by laws whose operation is entirely local, and for objects which are also .-local; for no person will suppose, that the President’s house, the Capitol, the Navy Yard, or other public' institution, was to be benefitted by these lotteries, or was to form a charge on the City revenue. Coming in aid of‘the City revenue, they are. of the same character with it j. the mere creature of a corporate power.
The circumstances, that the lottery cannot be drawn without the permission of the President, and that this resource is to be used only. for important improvements, have been relied on as giving'to this corporate power a inore extensive operation than is given to those with which it is associated. We do not think so.
The President has no agency in the lottery. It does not originate with him, nor is the improvement to which its profits are to be applied to be selected by him. Congress has not enlarged the corporate power by restricting its exercise to cases of which' the President might approve.
*447 We very readily admit, that the act establishing the seat of government, and the act appointing commissioners to superintend the public buildings, are laws of universal obligation. We admit, too, that the laws of any . State to defeat the loan authorized by Congress, would have been void, as would have been any attempt to arrest the progress of the canal, or of any other measure which Congress may adopt. These, and all other laws relative to theDistrict, have the authority which may be claimed by other acts of the national legislature ; but their extent is to be determined by those rules of construction, which are applicable to all. laws. The act incorporating the Gity of Washington, is, unquestionably,' of universal obligation ; but the extent of the corporate powers conferred by that act, is to be determined by those considerations which belong to the case.
Whether, we consider the general -character of a law incorporating a City, the objects for which such law is usually made, or the words in which this párticular power is conferred,, we arrive at the same result. The Corppration was merely empowered to authorize the drawing of lotteries; and the mind.of Congress was not directed to any provision for the sale of the tickets beyond the limits of the Corporation. That subject does not seen! to have been taken into view. It is the unanimous opinion of the Court, that the law cannot be construed to embrace it.
Judgment affirmed.
*448 Judgment. This cause came on to be heard on the transcript of the record of the Quarterly Session Court for the Borough of Norfolk, in the Commonwealth of Virginia, and was argued by counsel. On consideration whereof, it is adjudged and ordered, that the judgment of the said Quarterly Session Court for the Borough of Norfolk, in this case, be, and the same is hereby affirmed, with costs.

 Vide new order of Court of the present term. Ante, Rule XXXÍI.

 The learned counsel hefe read the following resolutions of the legislature of Virginia.
Extract from the Journal of the Senate of the Commonwealth of Virginia, begun and held at the Capitol in the City of Richmond, the 4th day of December, 1809.
Friday, January 26, 1810. “ Mr. Nelson reported from the Committee to whom were committed the preamble and resolutions on the amendment proposed by the legislature of Pennsylvania, to the constitution of the United States, by the appointment of anr impartial tribunal to decide disputes between the State and federal judiciary, that the Committee had, according to order, taken the said preambles and resolutions under their consideration, and directed him to report them without any amendment. And on the question being put thereupon, the same were agreed to unanimously, by the House, as follows: The Committee to whom was referred the communication of the Governor of Pennsylvania, covering certain reso *359 lutions of the Legislature of that State, proposing an amend-nient to the constitution of the United States, by the appointment of an impartial tribunal to decide disputes between the State and federal judiciary, have had the same under their consideration, and are of opinion that a tribunal is already provided by the Constitution of the United States, to wit: The Supreme Court, more eminently qualified from their habits and duties, from the mode of their selection, and from the tenure of their offices, to decide the disputes aforesaid, in an enlightened and impartial manner, than any other tribunal which could be created. The members of the Supreme- Court are selected from those in the United States who are most celebrated for virtue and legal learning, not at the will of a single individual, ■but by the concurrent wishes of the President and Senate of the United States ; they will, therefore, have no local prejudices and partialities. The duties they have to perform lead them necessarily to the most' enlarged and accurate acquaintance with the jurisdiction of the federal, and several State Courts, together with the admirable symmetry of our Government. The tenure of their offices enables them to pronounce the sound and correct opinions they may have formed, without fear, fa-vour, or partiality. The amendment to the constitution proposed by Pennsylvania, seems to be founded upon the. idea that the federal judiciary will, from a lust of power, enlarge their jurisdiction, to the total annihilation of the jurisdiction of the State Courts ; that they will exercise their will instead of the law and the constitution. This argument, if it proves any thing, would operate more strongly against the tribunal proposed to be created, which promises so little, than against the Supreme Court, which, for the reasons given before, have every thing connected with their appointment, calculated to insure confidence. What security have we, were the proposed amendment adopted, that this tribunal would not substitute their will *360 and their pleasure in place of the law ? The judiciary are the weakest of (he three departments of government, and least dangerous to the political rights of the constitution. They hold neither the purse nor the sword ; and even to enforce their own judgments and decrees, must ultimately depend upon the executive arm. Should the federal judiciary, however, unmindful of their weakness, unmindful of the duty which they-owe to themselves and their country, become corrupt, and transcend the limits of their jurisdiction, would the proposed amendment oppose even a probable barrier to such an improbable state of things ? The creation of a tribunal such as is proposed by Pennsylvania, so far as we are enabled to form an idea of it, from the description given in the resolutions of the legislature of that State, would, in the opinion of your Committee, tend rather to invite, than prevent a collision between the federal and State Courts. It might also become, in process of time, a serious and dangerous embarrassment to the operations of the general Government.
Resolved, therefore, that the legislature of this State do disapprove of the amendment to the constitution of the United States proposed by the legislature of Pennsylvania.
Resolved, also, that his excellency the Governor be, and is hereby requested to transmit forthwith, a copy of the foregoing preamble and resolutions to each of the Senators and Representatives of this State, in Congress, and to the executives of the several States in the Union, and request that the same be laid before the legislatures thereof.”
Extract from the Journal of the House of Delegates of the Commonwealth of Virginia:
“ Tuesday, January 23, 1810. The House, according to the order of the day, resolved itself into a committee of the whole house on the state of the Commonwealth, and after some time spent therein,'Mr. Speaker resumed the chair, and *361 Mr. Robert Stanard reported that the committee had, according to order, had under consideration the preamble and resolutions of the select committee to whom were referred that part of the Governor’s communication which relates to the amendment proposed to the Constitution of the United States, by the legislature of Pennsylvania, had gone through the same, and directed him to report them to the House without amendment; which he handed in at the clerk’s table, and the question being put on agreeing to the said preamble and resolutions, they were agreed .to by the House unanimously.